UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

CHOSEN CONSULTING, LLC, d/b/a          )
CHOSEN HEALTHCARE, INDIANA            )
ATC JV LLC, d/b/a HICKORY             )
RECOVERY NETWORK, HIGHLAND            )
RECOVERY LLC, d/b/a HICKORY           )
TREATMENT CENTER AT HIGHLAND,         )
CHOSEN HIGHLAND, LLC, and             )
HICKORY HOUSE RECOVERY, LLC,          )
                                      )
                  Plaintiffs,         )
                                      )
      v.                              )   Cause No. 2:20-CV-246-PPS-JEM
                                      )
TOWN COUNCIL OF HIGHLAND,             )
INDIANA, HIGHLAND MUNICIPAL           )
PLAN COMMISSION, and TOWN OF          )
HIGHLAND, INDIANA,                    )
                                      )
                  Defendants.         )

**OPINION AND ORDER**

This action is a property dispute between a proposed sub-acute healthcare

facility and the Town of Highland. Dating back to the 1970s, a property located in

Highland was the site of Highland Nursing and Rehabilitation Center. This facility,

which historically operated as a nursing home under the local zoning code, provided

medical treatment to patients pursuant to a dual-certification as a nursing facility and

skilled nursing facility. In 2019, Plaintiffs Chosen Consulting LLC, Chosen Highland,

LLC, Hickory House Recovery, LLC, Highland Recovery LLC, and Indiana ATC JV

LLC tried to transition the property to primarily serve patients suffering from

addiction-related physical or mental ailments, including substance abuse disorders.

(Unless context requires otherwise, for simplicity's sake I will refer to the Plaintiffs in this opinion collectively as "Chosen.") As part of this transition, Chosen gave up the facility's dual-certification. To re-open as a drug treatment facility, Chosen must obtain a new certification as a sub-acute facility from the Indiana Family and Social Services Administration (FSSA).

Chosen has been unable to obtain certification as a sub-acute facility. It blames the logjam on the Town of Highland and its planning commission. Chosen alleges that Highland improperly withheld zoning approval of the new proposed use of the property, which prevents them from obtaining sub-acute facility certification from FSSA. Thus, according to Chosen, it is stuck in a bureaucratic snarl — it can't get certified by the FSSA without a letter from Highland noting compliance with local zoning laws, but Highland refuses to provide such a letter. In Count Two of its complaint, Chosen seeks a declaratory judgment that the property is correctly zoned for the new proposed use. Evidently, Chosen thinks that a declaration from me will satisfy FSSA in lieu of a letter from the local zoning folks. In Count One, Chosen further asserts that Highland's  conduct was animated by prejudice against individuals suffering from drug addiction, and thus constitutes unlawful discrimination in violation of Title II of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act.

Highland seeks judgment on the pleadings. [DE 56.] As outlined more fully below, I find that because Chosen failed to obtain a final decision from the local zoning authorities, the declaratory relief claim will be dismissed without prejudice. But because

Chosen plausibly alleges that Highland intentionally engaged in an unfair zoning approval process to preclude formal approval of the property's new use, and did so because the proposed residents are substance abusers, the ADA claim will not be dismissed at this stage.

## Background

Plaintiffs are a mishmash of several interrelated LLCs operating in the medical services field. In summary, in April 2019, Chosen Highland, LLC acquired the property and took control of Highland Nursing and Rehabilitation Center. [DE 38, ¶ 12.] Chosen Consulting LLC, operating as Chosen Healthcare, managed the facility for Chosen Highland until June 30, 2019. *Id.*, ¶¶ 1, 11, 13. Indiana ATC JV LLC, operating as Hickory Recovery Network, also manages residential healthcare facilities in the State, including facilities providing treatment for drug-addiction and related ailments. *Id.*, ¶ 2. When, in mid-2019, Plaintiffs opted to transition the use of the Property to focus on treating drug addiction and related ailments, Hickory Recovery Network was on deck to manage the new proposed sub-acute treatment facility. *See id.* Hickory Recovery Network, in turn, delegated management of the proposed sub-acute facility to Highland Recovery LLC, which operates as the Hickory Treatment Center at Highland. *Id.*, ¶ 3. Another Hickory entity, Hickory House Recovery, LLC, was tasked with obtaining the state certification required to open the facility for its new use. [DE 38, ¶ 5.] As I mentioned earlier, unless context requires otherwise, I will simply refer to the Plaintiffs collectively as "Chosen."

3

The Town of Highland is an Indiana municipality. [DE 38, ¶ 6; DE 40 at 2.] As pertains to zoning issues, the municipality acts through the Town Council of Highland, a body of elected officials empowered to adopt ordinances and resolutions on behalf of that municipality [DE 38, ¶ 8, DE 40 at 3], and the Highland Municipal Plan Commission, a body of elected officials who assist in the administration of Highland's local zoning code [DE 38, ¶ 7]. (For simplicity, I will refer to these parties collectively as "Defendants," or "Highland.")

Chosen alleges that, since the 1970s, the Highland Nursing and Rehabilitation Center operated as a nursing home under Section 18.05.250 of the Highland Municipal Code. *Id.*, ¶¶ 16–17. It did so pursuant to a dual-certification from the State as a nursing facility and skilled nursing facility. *Id.* Although the property was located in a residential zoning district, a local ordinance approved its conditional use as a 40-bed nursing home. [DE 56-1 at 1; DE 56-1 at 2–3.] At some point over the next 50 years, Highland amended the Municipal Code to remove the nursing home as a conditional use of the Property. [*See generally* DE 56-1 at 4–275 (Highland Municipal Code, September 13, 2021).] Instead, thereafter, the property operated as a "legal nonconforming use." That's zoning-speak for saying the nursing home was grandfathered in as a lawful use despite being located in a residential-zoned district.

Section 18.05.250 of the Highland Municipal Code defines a nursing home as

> An institution where infirm persons or the aged or children reside, where in-patient physician and nursing care may be provided to persons suffering from physical or mental ailments, where daily out-patient physician and nursing care

4

> may be provided, and where administrative and staff offices
> and living quarters operating as an integral part of such
> institution may be provided.

[DE 38, ¶ 15; DE 56-1 at 39.] Chosen claims that, as a component of services provided

pursuant to its dual-certification, the nursing home historically provided occasional

care to patients suffering from addiction-related physical or mental ailments, like

substance abuse disorders. [DE 38, ¶ 14.] But in mid-2019, Chosen decided to shift its

focus to primarily treating patients with drug-related ailments. In the process, it gave

up the dual-certification of Highland Nursing and Rehabilitation Center as both a

nursing facility and skilled nursing facility, and sought to transition to a sub-acute

facility under Indiana Code § 12-22-2 and a nursing home under Highland's Municipal

Code § 18.05.250. *Id.*, ¶¶ 17–19. At the time, Chosen notified Highland about the

transition plans and did not receive any push back. *Id.*, ¶ 20.

By the end of the summer, Chosen was ready to get the property certified as a

sub-acute facility. But there was one last hurdle: FSSA informed Hickory House

Recovery, LLC (the entity seeking certification) that Chosen would need to "submit a

letter from the Town of Highland stating that the proposed use as a sub-acute facility

meets Highland zoning requirements." *See id.*, ¶¶ 21–24. Chosen went to the Highland

Municipal Plan Commission and requested a letter confirming its understanding that

the new proposed use remained consistent with the existing legal nonconforming use of

the property as a nursing home. The Commission demurred, saying it "did not have the

authority or jurisdiction to issue such a letter." *Id.*, ¶¶ 25–26. The request was

forwarded to the Town Council, *id.* ¶ 26, and in October 2019, Chosen's counsel sent a

proposed legal opinion to the Town's lawyers making the case for why the sub-acute

facility would fall within the historic legal nonconforming use of the property, *id.*

¶¶ 27–28.

Some time went by. In May 2020, Highland's lawyer sent back a draft letter to

Chosen's counsel, which adopted the legal analysis proposed by Chosen. [DE 38, ¶ 29.]

But mysteriously, after passing along the draft, Highland stopped responding to

Chosen's requests for a final letter, *id.* ¶ 30. Eventually, Chosen learned that it would

not be obtaining a final letter because "at least one" member of the Town Council

"affirmatively opposed" the new proposed use of the Property, *see id.* ¶ 31.

Chosen claims that Highland's decision not to issue the letter centered on

"community concern that drug addicts would be sent to the sub-acute facility and

would be free to leave at will, sign themselves out, and walk the neighborhood." *Id.*

Such concern was allegedly propagated by Mark Schocke, a member of the Town

Council. Schocke opposed issuing the letter after discussing "the proposed transition

with family and other members of the community who were opposed." *Id.* According to

Chosen, Schocke made it clear he did not want a bunch of "drug addicts . . . walk(ing)

the neighborhood." [DE 63 at 12–13; DE 63-1 at 3.] Chosen says that Highland's refusal

to issue a letter so as to satisfy the FSSA's requirements causes two distinct harms: first

its business interests are greatly impacted by the decision; and second, individuals in

Highland who need drug-treatment services are prevented from receiving this

important care. [DE 38, ¶ 32.] It is against this backdrop that I evaluate Highland's

motion to dismiss Chosen's request for declaratory relief and the ADA claim.

**Discussion**

**<u>Legal Standard</u>**

Defendants request judgment on the pleadings pursuant to Federal Rule of Civil

Procedure 12(c). Fed. R. Civ. P. 12(c). The Seventh Circuit has held that after the close of

pleadings a defendant may raise various Rule 12(b) defenses in a motion for judgment

on the pleadings under Rule 12(c). *Alexander v. City of Chicago*, 994 F.2d 333, 336 (7th Cir.

1993). In this situation, I review Defendants' Rule 12(c) motion under the same standard

for the corresponding Rule 12(b) motion to dismiss. *Id.*

Federal Rule 12(b)(1) requires dismissal if the court lacks subject matter

jurisdiction. Fed. R. Civ. P. 12(b)(1); *see, e.g., Estate of Eiteljorg v. Eiteljorg*, 813 F. Supp. 2d

1069, 1073 (S.D. Ind. 2011). Federal courts are courts of limited jurisdiction, and this

jurisdiction only extends to "Cases" and "Controversies." U.S. Const. art. III, § 2;

*Johnson v. U.S. Office of Pers. Mgmt.*, 783 F.3d 655, 660 (7th Cir. 2015). Thus, federal courts

have developed various doctrines of justiciability. These rules collectively establish "the

constitutional and prudential limits to the powers of an unelected, unrepresentative

judiciary." *Allen v. Wright*, 468 U.S. 737, 750 (1984) (internal quotation and citation

omitted), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*,

572 U.S. 118 (2014); *see also Silha v. ACT, Inc.*, 807 F.3d 169, 172–73 (7th Cir. 2015).

Ripeness, like other Article III doctrines, is a "fundamental limit" on my

7

jurisdiction. *Allen*, 468 U.S. at 750. Thus, if a claim is not ripe for resolution—including, for example, where the plaintiff has failed to exhaust local or administrative remedies prior to filing claims in federal court—the "proper disposition" is to dismiss the claim without prejudice. *Med. Assurance Co. v. Hellman*, 610 F.3d 371, 375 (7th Cir. 2010) (citing *Nationwide Ins. v. Zavalis*, 52 F.3d 689, 693 (7th Cir. 1995)). In *Zavalis*, for example, the Seventh Circuit held that the district court was "correct to dismiss" an insurer's request for declaratory relief concerning its duty to indemnify the defendant for property damage. Since the defendant's liability for the underlying damage had not been determined in a parallel state court proceeding, the insurer's "duty to indemnify [was] not ripe for adjudication." 52 F.3d at 690–93; *accord Hellman*, 610 F.3d at 375.

Courts distinguish between "facial" and "factual" challenges to subject matter jurisdiction brought under Rule 12(b)(1). *Apex Dig., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443–45 (7th Cir. 2009). In a "facial" challenge, the defendant "argues that the plaintiff has not sufficiently '*alleged* a basis of subject matter jurisdiction,'" *Silha*, 807 F.3d at 173 (citing *Apex Dig.*, 572 F.3d at 443–44), and I apply the same standard applicable to a Rule 12(b)(6) motion to dismiss, *id.* at 174 ("[W]hen evaluating a facial challenge to subject matter jurisdiction under Rule 12(b)(1), a court should use *Twombly-Iqbal*'s 'plausibility' requirement, which is the same standard used to evaluate facial challenges to claims under Rule 12(b)(6)."). By contrast, a "factual challenge" asserts that "'there is *in fact* no subject matter jurisdiction,' even if the pleadings are formally sufficient." *Id.* at 173 (citing *Apex Dig.*, 572 F.3d at 444). In this situation, I am allowed to

"look beyond the pleadings and view any evidence submitted to determine if subject matter jurisdiction exists." *See id.* To survive a factual challenge to the court's jurisdiction, the plaintiff must "come forward with 'competent proof'" establishing jurisdiction "by a preponderance of the evidence." *Lee v. City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003) (quoting *Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856, 862 (7th Cir. 1996)).

Federal Rule of Civil Procedure 12(b)(6) permits a party to move for dismissal if the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To avoid dismissal under Rule 12(b)(6), a claim for relief must be "plausible on its face." *Proft v. Raoul*, 944 F.3d 686, 690 (7th Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility requires the plaintiff to plead sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Taha v. Int'l Brotherhood of Teamsters, Local 781*, 947 F.3d 464, 469 (7th Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Seventh Circuit has explained that the plaintiff must plead facts that "suggest a right to relief that is beyond the speculative level," which requires alleging "enough details about the subject-matter of the case to present a story that holds together." *Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 614 (7th Cir. 2019); *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). While I must accept the complaint's allegations as true and draw all reasonable inferences in Plaintiffs' favor, *see Bradley Hotel Corp. v. Aspen Specialty Ins. Co.*, 19 F.4th 1002, 1006 (7th Cir. 2021), "sheer

speculation, bald assertions, and unsupported conclusory statements" in the complaint fail to meet this burden, *Taha*, 947 F.3d at 469.

Finally, for purposes of evaluating Defendants' motion under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), I look to the pleadings. The pleadings "include the complaint, the answer, and any written instruments attached as exhibits." *N. Indiana Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 452 (7th Cir. 1998) (citing Fed. R. Civ. P. 10(c)); *see also* Fed. R. Civ. P. 7(a). However, when a party presents extrinsic evidence outside the pleadings in briefing a Rule 12(c) motion for judgment on the pleadings, I have the discretion to consider any of those materials, or exclude them and continue my analysis under Rule 12. *See, e.g.*, *McDougle v. Watson*, No. 3:17-cv-91-JPG-DGW, 2017 WL 6044099, at *2 (S.D. Ill. Nov. 6, 2017) (citing *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998)). If I consider any of the materials, I "must" convert a Rule 12(c) motion for judgment on the pleadings to a Rule 56(a) motion for summary judgment. Fed. R. Civ. P. 12(d); *Fed. Mut. Ins. Co. v. Coyle Mech. Suply Inc.*, 983 F.3d 307, 313 (7th Cir. 2020) (citations omitted) (while Rule 12(d) affords courts discretion to convert motion to motion for summary judgment, when court considers materials outside the pleadings, such "discretion ends, and the court 'must' treat the motion as one for summary judgment"). This rule has exceptions: for example, I "may consider judicially noticed documents," like public records, "without converting a motion . . . into a motion for summary judgment." *See Menominee Indian Tribe of Wis. v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998).

10

Although numerically out of order, I will take up Count Two first, the count requesting relief under the Declaratory Judgment Act.

### Count Two — Declaratory Judgment

Highland first seeks dismissal of Chosen's declaratory relief count. Highland argues that prior to seeking a declaratory judgment on the zoning issue in federal court, Chosen must first "exhaust [its] administrative remedies to obtain a final decision from Highland." [DE 57 at 4.] The failure to do so, Defendants argue, deprives the Court of jurisdiction to rule on whether the property's new proposed use as a sub-acute facility falls within the scope of its prior designation as a "legal nonconforming use" nursing home. [*Id.* at 4–10; DE 66 at 2–12.] In short, rather than sprinting to federal court, Highland tells me that Chosen could have either sought a use variance or appealed the Town Council's declination of the requested zoning-approval letter to the Highland Board of Zoning Appeals (BZA). Chosen, for its part, says that the property's new proposed use as a sub-acute facility did not require any substantive zoning changes, so it was not required to petition BZA for a use variance, and the BZA lacks jurisdiction over the Town Council's decision not to issue the requested letter. [DE 63 at 9–20.]

The Declaratory Judgment Act empowers federal courts with discretionary authority to issue declarations regarding "the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). However, I may not intervene in the "absence of an 'actual controversy' between the parties." *Devereaux v. City of Chicago*, 14 F.3d 328, 330 (7th Cir. 1994); *Crowley Cutlery Co. v. United States*, 849

F.2d 273, 276 (7th Cir. 1988) ("[T]he declaratory-judgment statute cannot amend Article III."). Whether a dispute presents a "controversy," as opposed to an abstract question of law unripe for resolution, is "necessarily one of degree," but the controversy "must be definite and concrete, touching the legal relations of the parties having adverse legal interests," and "must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a *hypothetical set of facts.*" *Devereaux*, 14 F.2d at 330–31 (emphasis added) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 277, 240–41 (1937)).

Thus, while the Declaratory Judgment Act grants federal courts broad discretion to craft relief, I am not permitted to weigh in on "abstract disagreements over administrative policies" involving local property disputes. *See, e.g.*, *Sprint Spectrum L.P. v. City of Carmel, Indiana*, 361 F.3d 998, 1002 (7th Cir. 2004) (noting "specific ripeness requirement for cases challenging land use decisions" of local authorities in federal court requires that "zoning authorities must be given an opportunity to 'arrive[] at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question' before its owner has a ripe challenge"). Under the Supreme Court's decision in *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, parties challenging local land use decisions in federal court first must exhaust administrative remedies in state court (also termed the "state-litigation" requirement) and obtain a "final decision" from local authorities. 473 U.S. 172, 186, 191, 193–94 (1985). While the Supreme Court, in *Knick v. Township of Scott*, recently overruled

the exhaustion requirement, it preserved the finality requirement. 139 S. Ct. 2162, 2179 (2019) ("The state-litigation requirement of *Williamson County* is overruled. A property owner may bring a takings claim under § 1983 upon the taking of his property without just compensation by a local government."). Therefore, I consider whether the refusal to grant Chosen a letter is a "final decision" from the Highland zoning authorities.

It seems pretty clear to me that what Chosen is really complaining about is an unfair local zoning process. Chosen argues that this process has unjustifiably prevented it from obtaining the last remaining input to new FSSA certification as a sub-acute facility. (The FSSA certification process, pursuant to 440 Ind. Admin. Code § 7.5-4-4(b)(4), requires a "certificate from the local zoning authority to occupy and operate a sub-acute facility or supervised group living facility on the site.") After allegedly giving Chosen the runaround for nearly a year, the Highland zoning authorities refused to issue the required letter due to animus toward drug addicts. In light of this drawn-out and ultimately fruitless process, Chosen asks me to step in and rule on the proper zoning of the property.

It goes without saying that I do not sit on the Highland Municipal Plan Commission, the Town Council, or the BZA. As discussed in further detail below, Chosen has a clear path to pursue a final decision on the propriety of the property's new proposed use through the local zoning process. Moreover, that local administrative process is subject to judicial review in the state court system, as needed. While I understand the frustration with the process as it stands, I decline to prematurely

interject myself in a local zoning dispute. *River Park, Inc. v. City of Highland Park*, 23 F.3d 164, 165 (7th Cir. 1994) (citing "oft-repeated" message that "[f]ederal courts are not boards of zoning appeals," and "[l]itigants who neglect or disdain their state remedies are out of court"); *see, e.g., Jackson v. Village of Western Springs*, F. App'x 842 (7th Cir. 2015) (affirming dismissal on ripeness grounds of zoning-related procedural due process claim based on plaintiff's failure to appeal unfavorable zoning board decision to zoning board of appeals and state courts, as provided by state law).

As spelled out in the BZA's jurisdiction, the zoning process is quintessentially local. Section 18.90.090 of the Highland Municipal Code provides that a "nonconforming use. . . shall not be changed to another use unless the resultant use meets a use which is first permitted in the current zoning classification." [DE 56-1 at 257.] Section 18.115.040(D)(2), in turn, grants BZA "exclusive jurisdiction" over any "[u]se variances," and requires BZA to render a "favorable or unfavorable recommendation" to the Town Council for any variance. *Id.* at 270. This process does not start or end with the Commission or the Town Council's legal counsel — the only parties that Chosen has allegedly consulted on the matter.

Even if the property's new proposed use does not require a variance, the municipal code grants BZA authority over "any other appeals authorized by statute." *Id.* This includes appeals taken from "any order, requirement, decision, or determination made by an administrative board or other body except a plan commission in relation to the enforcement of [a] zoning ordinance." Ind. Code. § 36-7-4-

14

918.1(2). In other words, if the Town Council inappropriately refused to issue a zoning-approval letter, that would constitute a "determination made by an administrative board or other body" subject to appeal before the Highland Board of Zoning Appeals in the first instance. Chosen alleges here that Highland made an "unjustified, unlawful, and belated decision to oppose [Chosen's] lawful use of the Property as a sub-acute facility." [DE 38, ¶ 32.] While Chosen now claims that the "decision" was not one "made by an administrative board or other body"—which conveniently deprives BZA of jurisdiction over the decision—it apparently got the message clearly enough to sue the Town Council. Finally, even if review before the BZA had been sought, the BZA's "final decisions" pertaining to administrative appeals, exceptions, uses, and variances are all considered zoning decisions subject to judicial review under Indiana law. *See* Ind. Code § 36-7-4-1016. So, granting Chosen's requested relief at this stage risks not only undermining the local zoning process, but also countenances hopscotching around Indiana state courts.

Chosen argues that all this talk about exhaustion misses the point, because granting the requested zoning-approval letter was a "purely ministerial" function that Defendants were mandated to perform. [*See* DE 63 at 9–11.] The Supreme Court of Indiana has indeed acknowledged that "public officials, boards, and commissions may be mandated to perform ministerial acts," provided "there is a clear legal duty to perform such acts." *Knutson v. Seberger*, 157 N.E.2d 469, 471 (Ind. 1959) (collecting cases). *Knutson* itself dealt with an appeal from an action in mandate brought by a

15

subdivider against the Dyer, Indiana Board of Trustees, following the Board's disapproval of the plat as presented and an immediate appeal to the State trial court, and is thus distinguishable from the current situation. *Id.* at 470–71. In *Price v. Indiana Department of Child Services*, the Supreme Court determined that a "ministerial act" means more than "mandatory language" in statute. A ministerial act is "non-discretionary," meaning it is performed "in a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to, or in the exercise of, his own judgment upon the propriety of the act being done." 80 N.E.3d 170, 176 (Ind. 2017) (internal quotation omitted).

That's a far cry from this situation. Chosen cannot point to its own interpretation of the use variance provision and definition of "nursing home" included in the Highland Municipal Code to argue that it was "ministerial" for local zoning officials to read them the same way. In this situation, the Indiana Administrative Code provides that *Chosen*, not Highland, "shall file" a zoning-approval "certificate" for the proposed sub-acute facility. 440 Ind. Admin. Code § 7.5-4-4(b)(4). Chosen has failed to identify any provision mandating that Highland must provide a zoning-approval letter or otherwise bless the use of the property as a sub-acute facility.

In short, the strange procedural posture in this case has all the hallmarks of an attempted juke around local zoning authorities. Chosen confidently claims that a drug treatment facility falls squarely within the scope of the property's prior use as a nursing home (and it may well be right about that), but the informal process that Chosen

16

actually pursued suggests that it hopes to avoid having to make that case before the BZA. I won't allow this head fake.

There is another oddity here. Chosen's real gripe seems to be with FSSA's "certificate" requirement under the Indiana Administrative Code. Evidently, that is all that prevents them from obtaining certification needed to open the property. Yet Chosen does not seek any relief from FSSA. If Chosen is correct that this is a no-brainer—the new proposed use of the property falls squarely within its legal nonconforming use—then why not attempt to satisfy FSSA's "certificate" requirement by proffering historic zoning documentation that permitted the property to operate as a nursing home in a residential-zoned district. I suspect it is because Chosen well understands exactly what FSSA wants: an official determination, run through the proper channels, that the *new use* complies with Highland's zoning code.

Whatever interpretation of the zoning code wins out, at this stage the issue remains the provenance of local authorities, and I decline to short-circuit the local process. Plaintiffs' declaratory relief claim will therefore be dismissed without prejudice.

### Count Two — Discrimination Under the ADA and Rehabilitation Act

Highland separately seeks dismissal of Chosen's ADA claim based on a supposed failure to plead facts sufficient to establish "but-for causation." [DE 57 at 12–15.] Because I find that the complaint plausibly alleges that Highland intentionally engaged in an unfair zoning approval process to mask its unlawful discrimination

against people with disabilities (substance abusers), this claim will not be dismissed on the pleadings.

Under Title II of the ADA, no disabled individual, "*by reason of such disability*," may be "excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity," or "subjected to discrimination" by a public entity. 42 U.S.C. § 12132 (emphasis added). *See generally* 42 U.S.C. §§ 12131–134; *Tennessee v. Lane*, 541 U.S. 509, 516–17 (2004). To establish a violation of Title II, a plaintiff must establish that she (1) is a "qualified individual with a disability"; (2) was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was otherwise discriminated against by any such entity; and that (3) the discrimination was the result of the plaintiff's disability. *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015). Because of the similarities between the two statutes, the same goes for Section 504 of the Rehabilitation Act: the plaintiff must show he "(1) is a qualified person; (2) with a disability; and that (3) the [state agency] denied him access to a program or activity because of his disability." *Id.* (citation omitted). *See generally* 29 U.S.C. § 794 *et seq.* Courts have found that the administration of zoning laws may qualify as an "activity" for purposes of Title II of the ADA. *See, e.g., Discovery House, Inc. v. Consolidated City of Indianapolis*, 43 F. Supp. 2d 997, 1002–03 (N.D. Ind. 1999), *abrogated on other grounds by Sakelaris v. Danikolas*, No. 2:05-CV-158, 2007 WL 917375 (N.D. Ind. Mar. 23, 2007).

Defendants focus on Chosen's failure to plead facts sufficient to establish that

"but for" the disability of the facility's proposed residents, Plaintiffs would have obtained the requested zoning-approval letter. Defendants rely primarily on *Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737 (7th Cir. 2006), where the court held to prove a discrimination case, the plaintiff must show that, "but for" his disability, he would have been able to access the services or benefits desired. *Id.* at 746–54. The problem for Highland is that *Wisconsin Community Services* was not decided at the pleadings stage of the case, but rather at summary judgment. Thus, the case is largely irrelevant for present purposes.

Chosen has stated a plausible claim of discrimination under the ADA based on Defendants intentionally creating an impenetrable local zoning process in order to target businesses seeking to primarily serve disabled community residents. Chosen alleges that the facility historically provided "treatment to individuals with addiction-related physical or mental ailments, including substance abuse disorders,"consistent with its use as a nursing home, and that these individuals are qualified individuals with disabilities. [DE 38, ¶¶ 2, 14, 19, 22, 38–39.] Chosen further alleges claims against public entities involving a public program, service, or activity, namely "the administration of zoning law." *Id.*,¶¶ 6–8; *id.* ¶¶ 25–32 (alleging specific conduct at issue in zoning process). Finally, Chosen alleges adverse consequences for qualified disabled individuals due to Highland's abuse of the local zoning process, namely, preventing Chosen "from providing much-needed" addiction-related medical services in Highland, which harms "those in need of the services." *Id.*, ¶¶ 22, 32, 40–43.

19

The complaint ties all of these elements together by laying out a succinct theory of Highland's animus. Between August 2019 and May 11, 2020, Chosen was moving along toward sub-acute facility certification — notifying the Town of its intention to transition the use of the property, checking off nearly every certification requirement, and even obtaining a draft zoning-approval letter from the Town's legal counsel reflecting the preferred zoning-approval language. *Id.*, ¶¶ 20–29. Then suddenly the Town did an about face and declined to issue a final letter. It did so after Mark Schocke, a member of the Town Council, expressed opposition "based on unfounded community concern that drug addicts would be sent to the sub-acute facility and would be free to leave at will, sign themselves out, and walk the neighborhood." *See id.*, ¶¶ 30–31. This 180 occurred after Schocke discussed concerns with his "family and other members of the community who were opposed." *Id.* All of which plausibly suggests that the reason for the Town's ultimate decision had nothing to do with the underlying zoning of the property and everything to do with fear of "drug addicts" roaming the neighborhood.

Critically, in seeking dismissal on the pleadings, Highland asks the Court to accept the inference that, had Chosen actually "transitioned" services to a use "other than a nursing home, regardless of the disabled status of potential clients or residents, the legal nonconforming use would have lapsed and Highland would have likewise required proper zoning procedure to be followed." [DE 57 at 15.] Defendants fail to provide any material outside the pleadings sufficient to demonstrate a lack of "but for" causation on this basis. And of course, at this stage, the inferences go the opposite

direction. While Highland identifies an important factual dispute regarding the motivation for the zoning approval process, that dispute is not appropriate for resolution on the pleadings. Highland will have ample opportunity to address that defense at summary judgment.

## Conclusion

For the reasons previously outlined, Chosen failed to exhaust local remedies to obtain a final decision from Highland in the underlying zoning dispute, which deprives this Court of jurisdiction over the declaratory relief count. But because Chosen plausibly alleges that Highland pursued an unfair zoning process to preclude formal approval of the property's new proposed because of the disability of the facility's proposed residents, that claim will not be dismissed on the pleadings.

**ACCORDINGLY:**

Defendants' Motion for Judgment on the Pleadings [DE 56] is **GRANTED IN PART.**

Count II, Plaintiffs' Declaratory Judgment claim regarding proper zoning of the Property under the Highland Municipal Code, is **DISMISSED WITHOUT PREJUDICE**. In all other respects, the motion [DE 56] is **DENIED**.

**SO ORDERED** on August 1, 2022.

___/s/ Philip P. Simon_____
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT