UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| CHOSEN CONSULTING, LLC, d/b/a CHOSEN HEALTHCARE, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | )  Cause No. 2:20-CV-246-PPS |
| | ) |
| TOWN COUNCIL OF HIGHLAND, INDIANA, *et al.*, | ) ) ) |
| | ) |
| Defendants. | ) |

## <u>OPINION AND ORDER</u>

Back in the 1970s, a property in Highland, Indiana was the site of Highland Nursing and Rehabilitation Center. It historically operated as a nursing home under the local zoning code, providing medical treatment to patients pursuant to a dual certification as a nursing facility and a skilled nursing facility. In 2019, Chosen Consulting, LLC elected to transition the property to primarily serve patients suffering from addiction-related physical or mental ailments, including substance abuse disorders.[1] As part of this process, the company gave up the facility's dual certification. To open its doors as a drug treatment facility, Chosen must obtain a new certification as a sub-acute facility from the Indiana Family and Social Services Administration (FSSA).

Chosen has been unable to obtain the necessary certification for the property, and it blames this state of affairs on the Town of Highland. The dispute boils down to

---

[1] As explained in my prior Opinion and Order on Defendants' motion for judgment on the pleadings [DE 72], Plaintiffs Chosen Consulting, LLC, Chosen Highland, LLC, Hickory House Recovery, LLC, Highland Recovery LLC, and Indiana ATC JV LLC are a set of related corporate entities. For simplicity's sake, I will refer to them collectively as "Chosen," unless context requires otherwise.

this: Chosen has cleared all the bureaucratic hurdles with the FSSA except one. To get the final certification it seeks from FSSA, Chosen must obtain a letter from Highland reflecting that its use of the property is in compliance with local zoning laws; but Highland refuses to provide such a letter. Chosen says this is due to Highland's distaste for substance abusers.

Several years ago, when this case was initially filed, Chosen asserted two legal claims. Count II was a declaratory judgment action seeking a declaration that the property complies with local zoning laws. [DE 38 at 9–11.] I dismissed this claim without prejudice, finding that Chosen had not exhausted its remedies to obtain a final decision from Highland's local zoning authorities as to whether its new proposed use of the property fell within the scope of its prior designation as a "legal nonconforming use." [DE 72 at 11–17.] I explained that before seeking a review of the local zoning process in federal court, Chosen first needed to obtain a final determination from the local powers that be. Count I asserted a claim of unlawful discrimination in violation of Title II of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act. [DE 38 at 6–9.] This claim was allowed to proceed to discovery. The gist of the claim is that Highland intentionally engaged in an unfair zoning approval process to mask its unlawful discrimination against people with disabilities (substance abusers).

Highland now seeks summary judgment on Count I, citing three grounds: *first*, Chosen lacks standing to seek damages for lost profits under Title II of the ADA and the

Rehabilitation Act; *second*, Chosen failed to exhaust its remedies under state law prior to filing suit, as required to obtain injunctive relief; and *third*, Chosen fails to identify any evidence that Highland officials acted with discriminatory intent in the course of the zoning approval process. [DE 125; *see* DE 126; DE 127; DE 130; DE 131; DE 132; DE 133; DE 136; DE 137.] After the parties had fully briefed Defendants' motion for summary judgment, Chosen filed a motion requesting leave to amend its complaint to assert new claims under 42 U.S.C. § 1983. Defendants have filed an objection to this motion, which is also ready for disposition. [DE 138; *see* DE 139; DE 140.]

I'll start with the summary judgment motion [DE 125], which will be granted because binding Seventh Circuit authority mandates dismissal. As for Chosen's motion for leave to amend its complaint [DE 138], it will be denied because it comes way too late.

## I.    Motion for Summary Judgment

### A.    Undisputed Facts

As the following factual summary lays bare, the crux of this dispute concerns the proper application of zoning law – a task ordinarily assigned to local government officials, at least in the first instance. The property at issue is located in Highland, Indiana. In September 1971, an ordinance authorized a conditional use of the property for "National Nursing Home, Inc., its successors and assigns, for the erection, operation, and maintenance of a nursing home." [DE 125-3 at 2–3 (Ordinance No. 645); DE 137 at 1.] Under the Town's zoning code in place at that time, the property was located in a

"Class 'A-1' Residence District" – so this "conditional use" (or "special use permit," as Highland sometimes refers to it) was necessary for the property to lawfully operate in that zoning district. [*See* DE 125-3 at 2.]

In April 2019, Chosen acquired the property. [DE 133 at 2 (noting that prior to acquiring it, Chosen had managed the property for the preceding five years).] Chosen's goal is to operate the facility as a "dual-certified nursing facility and skilled nursing facility to focus on providing continued services as (a) a sub-acute facility pursuant to Ind. Code § 12-22-2 and (b) a Nursing Home pursuant to Section 18.05.250 of the Highland Municipal Code." *See id.* at 4. As part of this transition, Chosen gave up the facility's dual certification. To re-open as a drug treatment facility, it must obtain a new certification as a sub-acute facility from Indiana's Family and Social Services Administration (FSSA). As noted above, Chosen has cleared all of the administrative hurdles from the FSSA, save one: FSSA requires Chosen to obtain a letter from Highland's zoning authorities stating that its proposed use of the property satisfies local zoning requirements. *Id.* at 4–5.

That gets us to the present zoning dispute. The parties agree that at some point during the intervening fifty years, the Highland Municipal Code and the Town's associated zoning map were amended and the property was re-designated into a "R-1A" residential district. [DE 133 at 3; DE 125-2 at 2 (Highland Zoning Map).] Highland asserts that the amendment of its zoning code and zoning map, resulting in a R-1A

4

designation of the property, "effectively removed the nursing home's special use permit and converted the use of the property into a legal non-conforming use." [DE 133 at 3.]

Chosen tells me it's not so simple. From its perspective, the zoning code provides that when "a use is classified as a use variance . . . and exists as a conditional or permitted use at the date of adoption of the ordinance codified in this title, it shall be, without further action of the town council, the zoning administrator or the board of zoning appeals, a legal use." *Id.* (citing DE 56-1 at 18 (Highland Municipal Code § 18.05.060(L)). Moreover, Chosen notes that Ordinance No. 645 did not define the term "nursing home."[2] [DE 125-3 at 2–3.] The current version of the zoning code defines "nursing home" broadly to include "an institution where infirm persons or the aged or children reside, *where in-patient physician and nursing care may be provided to persons suffering from physical or mental ailments*, where daily out-patient physician and nursing care may be provided, and where administrative and staff offices and living quarters operating as an integral part of such institution may be provided." [DE 56-1 at 39 (Highland Municipal Code § 18.05.250(I)) (emphasis added).]

In sum, from Chosen's perspective, the property continued to operate as a legal nonconforming use in the new R-1A district — notwithstanding the fact that, in the interim, Highland amended its zoning code and Chosen voluntarily gave up the facility's dual certification while converting its use to a drug treatment facility. The

---

[2] It's unclear whether the phrase was defined in the zoning code in place in September 1971, when the conditional use was originally permitted. The parties did not submit any evidence one way or the other.

upshot is that Chosen does not believe its new proposed use requires any further approval from the Town's zoning authorities.

On July 9, 2019, Melissa Durkin, a business executive with an entity affiliated with Chosen, met with Ken Mika (Highland's Building Commissioner and Zoning Administrator) and Mark Herak (a Town Councilman) and followed up with an email entitled "Highland Nursing and Rehab Follow-up." [DE 63-1 at 6.] This is the first indication that Town officials were aware of Chosen's planned transition of the facility. The parties agree that in the fall of 2019, Chosen's representatives requested a letter from Highland affirming that Chosen's proposed use of the property conformed with what it contended was the property's "existing legal nonconforming use" under Ordinance No. 645. [DE 137 at 3; DE 133 at 5; *see* DE 125-1 at 6, ¶¶ 25–28.]

In November 2019, several new members were elected to Highland's Town Council, and John Reed became the Town attorney. [DEE 133 at 8.] Reed has submitted an affidavit, in which he declares that he prepared a "draft" letter to Jim Wieser, one of Chosen's representatives, via email on May 11, 2020. [DE 125-7.] Importantly, the cover email stated that the letter was "only a draft" and Reed did "not have approval to officially send it to [Chosen] so that [the company] may rely upon it." *Id.* at 5. Reed invited Wieser to give him his "thoughts" on the draft. *Id.* The letter states that the property is located in a residential district. It continues by noting that the "former Highland Nursing Home was not qualified to operate in the R-1 zoning district" but "was permitted as a legal non-conforming use," citing to the two previously cited

provisions in Highland's zoning code. *Id.* at 7. Reed's letter concludes by stating that the "proposed use as a residential addiction treatment facility is permitted as a legal non-conforming use." *Id.* at 8. At his deposition, Reed confirmed that this opinion was based on "review[ing] the current zoning code at that time to check and verify the current definition of rest home, nursing home, et cetera." [DE 125-5 at 3–7.]

No final letter was ever issued. On June 5, 2020, Durkin followed up with Councilman Herak via email, asking for a call to confirm "where we are in the process." [DE 63-1 at 6; *see* DE 137 at 3–4.] On June 5, 2020, Herak emailed Durkin, stating that he had "no knowledge of where the process is, as there is nothing happening." He added that the town attorney (Reed) had indicated "he didn't think it was a protected class" and, for purposes of the zoning code, " a drug rehab doesn't fall under nursing care." Herak said he would "leave it to the lawyers." [DE 63-1 at 5.]

Later in the same email thread, Herak confirmed that the Town Council had considered Chosen's request for a letter approving the proposed use. According to Herak, Mark Schocke, the President of the Town Council, was "1 of 3 new board members who are against the project." *Id.* This was notable, because it meant a majority of the Town Council members were opposed to the proposed use of the facility and issuance of a zoning approval letter. Herak further recalled that Schocke had "commented on" Chosen's request, to the effect "that someone had reached out to him and with [t]he school where his wife [t]eaches a block down." Based on this, Schocke was apparently "opposed to the idea." Whatever "agreement [Chosen] thought [it]

had," Herak relayed, Schocke had "brow beated the town attorney and he's changed his opinion." *Id.* at 4–5. Herak reiterated a few days later that he believed Schocke's wife was opposed to the proposed drug treatment center because she teaches at a nearby school, and Herak "assume[d] they think that drug addicts will be sent there, able to leave at will, sign out themselves, walk the neighborhood," endangering students and neighbors. *Id.* at 3.

At his deposition, Herak confirmed that he recalled that Schocke had "commented" on Chosen's request for a zoning approval letter. While Herak did not recall what Schocke said specifically, he remembered that the comment "involved the proximity of Chosen's facility to his wife's school," as reflected in his emails with Durkin. [DE 130-1 at 3–5.] Herak testified that he did not recall that the Town Council "had a meeting regarding this letter" and that Chosen had been previously advised by Mika "that they needed to go get a use variance." [DE 131-1 at 3–4.] In sum, Herak testified that after Durkin followed up in June 2020, he told her that he was unaware of a zoning approval letter being issued. When it came up, he involved the Town attorney; and the Town Council later discussed the matter in an executive session – a privileged discussion that remained shielded from the public record. *Id.* at 5.

Unable to obtain its requested zoning approval letter, Chosen filed this lawsuit seeking a declaration that the property is properly zoned and asserting that the Town's actions violate federal prohibitions on discrimination against disabled persons (*i.e.*, the substance abusers Chosen intends to treat on the property). As prefaced, I previously

dismissed the declaratory relief action, finding that—despite its artful

pleading—Chosen was required to first pursue its request for zoning approval through

Highland's Board of Zoning Appeals (BZA), and then exhaust its remedies to seek

judicial review of any final determination of the BZA in state court, prior to seeking a

declaratory judgment on the zoning issue in federal court. [DE 72 at 14–15.] However, I

found that the complaint adequately pled facts supporting a plausible inference that

Highland officials intentionally engaged in an unfair zoning approval process to mask

unlawful discrimination against substance abusers, and thus permitted Chosen's

discrimination claim to proceed to discovery. With this dense record set forth, I'll now

turn to the substance of Highland's arguments for summary judgment.

> **B.    Discussion**

Let's start, as usual, with the standards that govern my decision making. Rule 56

of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A

motion for summary judgment has been described as the time in a lawsuit to "put up or

shut up." *Grant v. Trustees of Indiana University*, 870 F.3d 562, 568 (7th Cir. 2017). If it is

clear that a plaintiff will be unable to satisfy the legal requirements necessary to

establish his or her case, summary judgment is not only appropriate, but mandated. *See

Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520

(7th Cir. 2003). When the non-moving party fails to establish "the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial," Rule 56(c) mandates entry of summary judgment against that party because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006) (quoting *Celotex*, 477 U.S. at 322–23). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Under Title II of the ADA, no disabled individual, "by reason of such disability," may be "excluded from participation in or be denied the benefit of the services, programs, or activities of a public entity," or "subjected to discrimination" by a public entity. 42 U.S.C. § 12132. *See generally* 42 U.S.C. § 12131–134; *Tennessee v. Lane*, 541 U.S. 509, 516–17 (2004). A violation of Title II requires a showing that the plaintiff (1) is a "qualified individual with a disability"; (2) was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was otherwise discriminated against by any such entity; and that (3) the discrimination was a result of the plaintiff's disability. *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015). The same is true for claims brought under Section 504 of the Rehabilitation Act. *See generally* 29 U.S.C. § 794 *et seq.* The first question is whether the administration of zoning laws may qualify as an "activity or service" for purposes of Title II of the ADA. Several courts have answered that question yes, and I will therefore proceed under that

10

assumption. *See Valencia v. City of Springfield*, 883 F.3d 959, 967 (7th Cir. 2018) (affirming

that Fair Housing Amendment Act of 1988, Title II of ADA, and Rehabilitation Act

"apply to municipal zoning decisions") (citing *Wis. Cmty. Servs., Inc. v. City of*

*Milwaukee*, 465 F.3d 737, 752 n.12 (7th Cir. 2006) (en banc)).

With Count II (the declaratory judgment count) having been previously

dismissed [DE 72 at 14–15], Highland now turns its attention to Count I, Chosen's

discrimination claim under the ADA and Rehabilitation Act. In Count I, Chosen seeks

both an injunction and damages in the form of lost profits. [*See* DE 38 at 8–9.]

Highland's first argument for dismissal focuses on standing for the damages claim.[3] The

second component of Count I—the request for an injunction—is challenged on the

ground that Chosen failed to exhaust its remedies through the BZA. I will take up each

argument in turn below.

### 1.    Lost Profit Damages

Under very similar circumstances to those presented in this case, the Seventh

Circuit has held that Title II of the ADA and Section 504 of the Rehabilitation Act do not

provide organizations like Chosen standing to recover damages in the form of lost

profits. *Discovery House, Inc. v. Consol. City of Indianapolis*, 319 F.3d 277, 280–81 (7th Cir.

2003). Highland says that *Discovery House* forecloses Chosen's damages claim, while

Chosen responds that other circuits have rejected *Discovery House*'s seemingly narrow

---

[3] Of course, it is well established that "a plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 185 (2000).

view of standing under Title II of the ADA and Rehabilitation Act. But what other circuits have to say on the issue is neither here nor there in the face of spot-on authority from *this circuit*. In this case, faithful application of Seventh Circuit precedent requires dismissal of Chosen's claim for damages in the form of lost profits.

Just like this case, *Discovery House* involved a for-profit corporation operating drug addiction rehab programs. The company attempted to open a methadone clinic and was initially told by local officials that it could open a facility at its preferred site, consistent with local zoning regulations. That decision was later challenged by those opposed to the facility. Eventually, the local BZA determined that the facility was not a permitted use in the district. As Discovery House appealed that decision in the state courts, it filed a separate lawsuit claiming that the BZA and City violated its rights under the ADA, Rehabilitation Act, and the Constitution's equal protection clause. That case was removed to federal court and a jury trial was held. Discovery House was ultimately awarded over a million dollars in lost profit damages – spanning from the period of time between the BZA's denial of a zoning permit and a state court decision that overturned the BZA's decision. *Id.* at 278–79.

On appeal, the Seventh Circuit homed in on the issue of whether Discovery House, as a for-profit entity that lacked direct standing to sue, had associational standing under Title II to pursue damages "which perhaps indirectly will benefit its clients, but which primarily [are] designed to benefit its for-profit business." *Id.* at 280. The court considered the statutory text of Title II's enforcement provision, 42 U.S.C.

12

§ 12133, noting that the "remedies, procedures, and rights" available under Title II of the ADA are those set forth in Section 505 of the Rehabilitation Act. Section 505 (29 U.S.C. § 794a), in turn, refers to remedies for *employment discrimination* codified in Title VI of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000d *et seq*.) – which clearly did not apply to the for-profit company before the court. *See* 319 F.3d at 280. In sum, the court reasoned that "[l]ooking . . . to the nature of the relief sought and the statutes under which standing is asserted, we see *no way* that either the *ADA or the RA contemplates a recovery for lost profits for a business* like that of the Discovery House," and the remedies permitted under Title II of the ADA and RA must "at the very least, be those which *directly benefit* the disabled." *Id.* at 280–81 (emphasis added). Consequently, Discovery House's claim was dismissed because it did "not have standing to seek lost profits" pursuant to Title II of the ADA and Section 504 of the RA. *Id.* at 281.

Notwithstanding this strong language in support of its position, Highland finds a way to gild the lily a bit in its briefing. They tell me that the Seventh Circuit in *Discovery House* distinguished between Title I and Title III of the ADA, which they say "explicitly provide protection for entities and individuals with known relationships to qualified individuals with disabilities," and Title II of the ADA, which does not. [DE 127 at 6; *see* DE 136 at 7.] I find no such analysis in the *Discovery House* opinion. Highland again claims in its reply brief that "Congress made a decision to provide for a right of associational standing under Titles I and III but not Title II," but they cite *no authority* in

support of this important proposition. [DE 136 at 7.] Without much help from the

parties, let's examine the merits of the argument.

Title I of the ADA governs employment and prohibits "discrimination against a

qualified individual on the basis of disability" in hiring, firing, and promotions, as well

as "other terms, conditions, and privileges of employment." 42 U.S.C. § 12111 *et seq.*

Section 12112(b)(4) makes it unlawful to deny employment opportunities to a "qualified

individual because of the known disability of an individual with whom the qualified

individual is known to have a relationship or association." Shifting gears, Title III

covers various enumerated categories of privately funded programs, such as places of

lodging, recreation, sales, education, and entertainment, and expressly bars

associational discrimination. 42 U.S.C. § 12182 *et seq.* It specifically prohibits

"discrimination-by-association," making it unlawful to "deny" equal services "to an

individual or entity because of the known disability of an individual with whom the

individual or entity is known to have a relationship or association." *Access Living of*

*Metro. Chicago v. Uber Techs., Inc.*, 958 F.3d 604, 610 (7th Cir. 2020) ("[A]n entity denied

equal services because of its association with someone who has a disability experiences

direct harm—is 'subjected to' discrimination—and therefore can invoke § 12188(a)(1) to

enforce the substantive prohibition embodied in § 12182(b)(1)(E).") (citing 42 U.S.C.

§§ 12182(b)(1)(E), 12188(a)(1)). Title II does not contain similar "relationship or

association" language, in contrast to Title I and Title III.

For its part, Chosen does not dispute that the damages it seeks in this case come in the form of lost profits during the period it has been unable to open the Highland property for its new proposed use. [*See* DE 132 at 23–25.] Instead, the company urges me to essentially ignore *Discovery House* and find that it has standing to pursue its damages claim based on out-of-circuit authorities rejecting the case as improperly decided.[4] But Chosen fails to engage with the apparent distinction between the scope of associational standing under Title I and Title III of the ADA, on one hand, and Title II, on the other. And its reliance on non-binding out-of-circuit case law, in the face of binding precedent from the circuit, is (of course) unavailing. Until the circuit revisits *Discovery House*, I am bound to faithfully apply it. A plain reading of the case indicates that it contemplates the precise situation before me: a for-profit company seeks to obtain money damages that only indirectly benefit the disabled individuals to whom it provides services and that more directly benefit its bottom line.

Chosen makes a last-ditch argument that any damages it obtains "will be quarantined and used primarily to benefit the individuals who will be served" at its

---

[4] As noted above, other courts around the country have come to different conclusions than the court in *Discovery House. See Addiction Specialists, Inc. v. Twp. of Hampton*, 411 F.3d 399, 406 (3d Cir. 2005), *abrogated on other grounds by Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013). *See also McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1142 (11th Cir. 2014); *A Helping Hand, LLC v. Baltimore Cnty., MD*, 515 F.3d 356, 364 (4th Cir. 2008). These cases suggest that *Discovery House* applies too high a standard in assessing the standing of entities like Chosen to seek lost profit damages under the ADA and RA. For example, the Third Circuit in *Addiction Specialists* found that the Seventh Circuit's analysis "ignores that the protections of the ADA and RA have been extended to shield entities *themselves* from discrimination," and that the broad remedial purposes underlying the ADA and RA do not limit relief to "qualified individuals with disabilities." The court thus determined that the proprietors of a proposed methadone clinic have standing to seek relief both on their own behalf and on behalf of their clients under the ADA and Rehabilitation Act. 411 F.3d at 405–08 (emphasis added). It does not appear that the Seventh Circuit has revisited the issue since *Discovery House*.

Highland facility [DE 132 at 24 (citing DE 130-3 at 3, ¶ 5)]. Again, this argument reinforces my view that the monetary damages Chosen seeks in this case are based on the profits it claims to have lost in the period it has been unable to open the Highland facility for its proposed use. Chosen does not dispute that its damages are based on its lost profits. More to the point, this creative but unworkable promise cannot carry the day. For starters, federal courts are courts of limited jurisdiction; it is well established that parties may not confer subject matter jurisdiction by agreement. *DeBartolo v. Healthsouth Corp.*, 569 F.3d 736, 740 (7th Cir. 2009). Moreover, a promise not to keep certain profits separate and used only for the services of Chosen's Highland facility ignores the reality that cash is fungible. That consideration appears to have been squarely on the court's mind in *Discovery House*, as the panel repeatedly emphasized the *for-profit* nature of the entity seeking to obtain damages that only indirectly benefitted the individuals to whom it provided methadone treatment.

In sum, pursuant to *Discovery House*, Chosen does not have standing to pursue a damages claim under Title II of the ADA and Section 504 of the Rehabilitation Act. Accordingly, this aspect of Count I will be dismissed.

### 2.     Injunctive Relief

As noted above, Chosen also seeks an injunction allowing it to open the Highland facility for its proposed use, notwithstanding the Town's zoning concerns. As a threshold matter, Chosen does not dispute that it never sought re-zoning of the property (or a use variance or exception) as it attempted to transition the property from

a dual-certified nursing home to a sub-acute drug treatment facility. [DE 133 at 5.]
While Highland has supplied evidence that the proposed use of the property as a sub-acute facility would require a use variance [*see* DE 125-6 at 7–9, 15–18], Chosen takes the
position that whether a use variance (or any other "final decision" from the BZA) was
required prior to filing the present lawsuit is a "determinative legal question" and not
an issue of material fact. [DE 133 at 5]. Chosen is correct that this presents a question of
law for me to decide at summary judgment.

    That said, I disagree with the substance of Chosen's position – *i.e.*, that it did not
need to further pursue its request for zoning approval to the BZA and (if necessary)
appeal any final decision entered by the BZA to the state courts, prior to seeking an
injunction in federal court. In my prior Opinion and Order dismissing Chosen's
declaratory relief action [DE 72 at 14–15], I noted that the Highland Municipal Code
provides that a "nonconforming use . . . shall not be changed to another use unless the
resultant use meets a use which is first permitted in the current zoning classification."
[DE 56-1 at 257.] Under Highland Municipal Code § 18.115.040(D)(2), the BZA retains
"exclusive jurisdiction for" any "[u]se variances" and provides a "favorable or
unfavorable recommendation to [the] town council." *Id.* at 270. Thus, if a use variance
was required for Chosen's proposed use, it failed to pursue the proper process with the
BZA. (Again, it is undisputed that Chosen never petitioned the BZA as it attempted to
transition the use of its facility.)

Further, if a use variance was *not* necessary to transition the property's use, as Chosen has repeatedly argued, I explained that the result would be no different. Highland Municipal Code § 18.115.040(D)(3) grants the BZA authority over "any other appeals authorized by statute." That's quite broad. Under state law, it includes appeals taken from an "order, requirement, decision, or *determination made by an administrative board or other body* except a plan commission *in relation to the enforcement of [a] zoning ordinance*." Ind. Code § 36-7-4-918.1(2) (emphasis added). The Town Council's refusal to issue Chosen's requested zoning approval letter clearly constitutes a "determination made by an administrative board or other body," which would be subject to appeal before the Highland Board of Zoning Appeals, at least in the first instance.

In other words, all roads to the relief Chosen seeks in the form of a federal court injunction would lead back to the BZA. Yet, for reason I do not understand, Chosen never pursued relief through the BZA. And even if Chosen had done so, this was merely the first step in the process. Any "final decision" the BZA reached—whether on a request for a use, exception, or variance, or following "any other appeal[] authorized by statute"—would be subject to judicial review under Indiana law. *See* Ind. Code § 36-7-4-1016.

In *River Park, Inc. v. City of Highland Park*, 23 F.3d 164 (7th Cir. 1994), the circuit reiterated an "oft-repeated" message: "Federal courts are not boards of zoning appeals." *Id.* at 165. Affirming the dismissal of a complaint for damages under § 1983 based on a municipality's intentional foot-dragging on a company's zoning

applications, the court in *River Park* expressed a healthy dose of skepticism for parties who seek federal court review of local zoning decisions. The panel's decision in particular emphasized how local zoning processes often "use political methods to decide, so that the only procedural rules at stake are those local law provides," and reaffirmed that "these rules must be vindicated in local courts" before a party seeks relief in federal court. *See id.* at 167. Indeed, the decision went so far as to state that federal courts should "not cooperat[e]" with litigants who "omit[] the steps necessary to obtain review in state court and hope for the best in a second-chance forum," and that such litigants "who neglect or disdain their state remedies" in the zoning context "*are out of court, period.*" *Id.* at 165 (emphasis added).

Highland, relying on these "strong words" in *River Park*, urges me to find that Chosen's failure to pursue available remedies through the BZA and, if necessary, the Indiana courts bars it from seeking injunctive relief in this federal forum. Chosen's response is tri-fold: (1) Title II of the ADA does not include a statutory exhaustion requirement; (2) lower courts in the Seventh Circuit have not imposed an exhaustion requirement in the absence of settled circuit authority; and (3) even if exhaustion of local and state law remedies was required, an equitable exception would apply in this case because its appeals "would be futile."

Although reasonable minds could disagree, I find that Defendants get the better of the argument. To hold otherwise would ignore that this dispute arises in the context of a disagreement over local zoning rules. As the court in *River Park* emphasized (quite

19

rightly), zoning is a quintessentially local process. And it's an area of the law where disputes are often driven by local politics – forces that federal courts have no occasion to wade into, unless and until a party has pursued its available remedies under state law.

That is not to suggest Highland's argument is a slam dunk. As I've acknowledged in other cases, most courts to consider the issue "have generally concluded that Title II does not have an exhaustion requirement." *Canfield v. Isaacs*, 523 F. Supp. 2d 885, 888 (N.D. Ind. 2007). It does not appear that the issue has been addressed by the Seventh Circuit. In the absence of settled circuit authority, several lower courts have concluded that a plaintiff need not exhaust administrative remedies to sue under Title II of the ADA. *See Staats v. Cnty. of Sawyer*, 220 F.3d 511, 518 (7th Cir. 2000) (noting that while the Seventh Circuit had not decided the issue, some lower courts have concluded that Title II does not require exhaustion of administrative remedies) (citing *Petersen v. Univ. of Wis. Bd. of Regents*, 818 F.Supp. 1276 (W.D. Wis. 1993)). But, on closer review, this line of argument is simply a red herring.

Consider this: *River Park* dealt with § 1983 claims. Judges have from time to time invented various doctrines to manage the mass of litigation brought under § 1983; but they have not imposed "a comprehensive administrative-exhaustion requirement" to bring such claims. *See Perez v. Wisconsin Dep't of Corr.*, 182 F.3d 532. 534 (7th Cir. 1999). While a comprehensive exhaustion requirement does not appear in the text of § 1983 and courts have not grafted one onto the statute, *River Park* affirmed dismissal of the

20

claims precisely because the appellant failed to take steps necessary to obtain review of its zoning dispute in state court before filing suit in federal court. Call it exhaustion, call it something else, the result is the same: a plaintiff who fails to pursue available remedies under state law, in the context of zoning, is "out of [federal] court, *period.*" *See* 23 F.3d at 165 (emphasis added).

What's more, *River Park* provides a clear rationale for requiring a plaintiff to seek review in state court before allowing him to turn a federal court into a "board[] of zoning appeals." This rationale applies narrowly to disputes involving quintessentially local zoning rules and regulations. By contrast, the cases Chosen has cited all reiterate that Title II of the ADA lacks an exhaustion requirement outside the zoning context. Stripped to its core, Chosen's argument is tantamount to suggesting that, while *River Park* has logical force in this context, I should ignore it in favor of far less analogous matters that happened to involve Title II claims. This didactic approach is just not persuasive.

Chosen's backup argument is that an equitable exception should apply because remedies available through the BZA (and by extension judicial review of any final decision entered by the BZA in the Indiana courts) "would be futile." [DE 132 at 12.] The undisputed facts in the record reflect that no later than June 2020, Chosen's representatives were made aware that its request for a zoning approval letter had been rejected. Or, at the very least, Chosen understood that (1) the Town Council had been made aware of its request for a zoning approval letter, (2) a majority of the Town

Council opposed its issuance, and (3) the Town Council would not be providing Chosen with a "final" version of the draft letter Reed had previously circulated. After this apparent rejection, Chosen suggests that an appeal of the Town Council's determination not to issue the zoning approval letter or a petition for a use variance—again, either of which would fall under the BZA's jurisdiction—would have been "futile." That is simply too much to stomach, given that over the better part of four years Chosen has not even attempted to initiate the process. To be candid about it, this position strikes me as little more than the logical extension of Chosen's strategy: doubling down on the argument that no use variance (or other appeal to the BZA) was required in the first instance.

I therefore decline to find an equitable exception to the commonsense rule that, prior to pursuing injunctive relief in connection with a local zoning process, Chosen was first required to exhaust its available remedies under local and state law. Because in this case Chosen undisputedly failed to do so, it may not seek to shortcut the process by obtaining a zoning injunction in federal court.

## II.    Motion for Leave to Amend

As the parties were briefing Defendants' motion for summary judgment, a related lawsuit was reassigned to me. [DE 26, *Chosen Consulting, LLC, et al. v. Town Council of Highland, et al.*, Cause No. 2:24-CV-003-PPS-JEM.] I was surprised to learn that back in January 2024, Chosen had filed suit against the same set of defendants (plus

Mark Schocke, albeit based entirely on actions he took in his capacity as a member of the Town Council).

In other words, some four years after filing this case, Chosen had taken another whack at the same defendants based on essentially the same nucleus of operative facts – now styling the action as asserting deprivations of its Fourteenth Amendment rights to equal protection and procedural due process under 42 U.S.C. § 1983. Clearly, something was amiss. In an Opinion and Order entered May 20, 2024, I dismissed Chosen's § 1983 claims under the rule against "claim splitting," which "prohibits a plaintiff from prosecuting its case piecemeal and requires that all claims arising out of a single wrong be presented in one action." *Chosen Consulting LLC v. Town Council of Highland, Indiana*, 2024 WL 2292042, at *4 (N.D. Ind. May 20, 2024) (quoting *Elmhurst Lincon-Mercury, Inc. Emps. 401(k) Profit Sharing Plan & Tr. v. Mears*, 215 F. Supp. 3d 659, 665 (N.D. Ill. 2016)).

About two months after its new lawsuit was dismissed, on July 12, 2024, Chosen filed a request to amend its complaint in this case. [DE 138.] This would be Chosen's third amended complaint; and its motion was filed well past the deadline to seek leave to amend the pleadings. [DE 32 (setting December 21, 2020 deadline for Plaintiffs to seek leave to amend pleadings).] Defendants predictably objected to the amendment and the motion is now ripe for my ruling. [DE 139; DE 140.] The proposed amendment parallels the claims in Chosen's 2024 lawsuit. In short, Plaintiffs now seek to assert that Defendants violated their Fourteenth Amendment rights to equal protection and

procedural due process by 'officially' denying their requests to access the property for use as a certified sub-acute facility, in violation of 42 U.S.C. § 1983. [DE 138-1 at 11–14.]

Rule 15(a)(2) provides that courts should "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, this does not mean that leave to amend should be granted as a matter of course. *Airborne Beepers & Video, Inc. v. AT & T Mobility LLC*, 499 F.3d 663, 666 (7th Cir. 2007). Rather, a court may deny leave to amend if there is "an apparent or declared reason for doing so, such as 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment or futility of amendment.'" *J.P. Morgan Chase Bank, N.A. v. Drywall Serv. & Supply Co.*, 265 F.R.D. 341, 346 (N.D. Ind. 2010) (quoting *Liu v. T & H Machine*, 191 F.3d 790, 794 (7th Cir. 1999)). In assessing whether to grant a request for leave to amend, courts may also "consider the burden that granting to leave to amend would place on the judicial system." *Id. See also Perrian v. O'Grady*, 958 F.2d 192, 195 (7th Cir. 1992) ("Because substantive amendments shortly before trial serve to defeat the public's interest in speedy resolution of legal disputes, [a] district court judge is entitled, in such circumstances, to refuse to allow a plaintiff's amendment.").

I am further guided by the notion that "[t]o amend a pleading after the expiration of the trial court's Scheduling Order deadline to amend pleadings, the moving party must show 'good cause.'" *Trustmark Ins. Co. v. Gen. & Cologne Life Re of Am.*, 424 F.3d 542, 553 (7th Cir. 2005) (quoting Fed. R. Civ. P. 16(b)). This "good cause"

standard "primarily considers the diligence of the party seeking amendment." *Id.* (internal quotation omitted). Plaintiffs tell me that good cause exists to permit another round of amendment long after the expiration of the court-imposed deadline to seek leave to amend the pleadings because they "did not become aware of new facts sufficient to support their claims" under § 1983 "until taking depositions in January 2023." [DE 140 at 2.] This characterization of events simply does not withstand scrutiny.

As I previously noted in evaluating the identical claims asserted in its separate lawsuit, Chosen obviously knew all along that it was dealing with state actors operating under color of law. Chosen's argument that it had no way of knowing that Highland officials made an official determination not to issue its requested zoning approval letter, and/or that this decision by Highland officials was undertaken under color of law, was a little hard to swallow. Chosen's original complaint in this case alleged that the company was informed that "at least one member of the Town Council affirmatively opposed issuance of the letter" and that this opposition "caused the member to *halt further consideration by the Town Council of the requested letter*." [DE 1, ¶ 28 (emphasis added).] Chosen's amended complaints made the same claim and further alleged that Defendants made an "unjustified, unlawful, and belated *decision* to oppose [Chosen's] lawful use of the Property as a sub-acute facility," Chosen had been "denied access to the Property for a lawful and proper use," and this "denial has prevented [Chosen] from providing much-needed services in the Town of Highland." [DE 22; DE 38.]

What's more, when Chosen apparently learned of a basis to assert its new claims, in January of this year, it did not seek leave to amend. Having opposed Highland's request to amend their answer nearly a year earlier [DE 88; DE 92], Chosen in all likelihood would have faced an uphill battle in persuading the court to grant leave to amend. So, evidently, Chosen made a strategic decision and filed a new lawsuit. After that new lawsuit was dismissed, Plaintiffs did not seek leave to amend in this case until nearly *two months* had passed. All of this reinforces my conclusion that Chosen's request to amend its complaint for a third time is not supported by good cause and should be denied.

**ACCORDINGLY:**

Defendants' Motion for Summary Judgment [DE 125] is **GRANTED**. Plaintiffs' Motion for Leave to File Third Amended Complaint [DE 138] is **DENIED**. The Clerk is **DIRECTED** to close the case.

**SO ORDERED**.

ENTERED: August 28, 2024.

 /s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT